# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **DILLON DRAKE, on behalf of himself and all others similarly situated,** | **CASE NO.:** |
| **Plaintiff** | **CLASS ACTION** |
| **v.** | **COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY AND INJUNCTIVE RELIEF** |
| **FORD MOTOR COMPANY, a Delaware corporation** | **DEMAND FOR JURY TRIAL** |
| **Defendant.** | |

Plaintiff Dillon Drake ("Plaintiff"), individually and on behalf of those similarly situated, brings this class action lawsuit against Ford Motor Company ("Ford" or "Defendant") based upon personal knowledge as to himself, and on information and belief as to all other matters.

## INTRODUCTION

1.      Plaintiff brings this class action on behalf of all purchasers and lessees of Ford F-150 vehicles against Defendant Ford Motor Company for its failure to accurately represent EPA fuel economy ratings.

2.      Next to the purchase of a house, buying a vehicle is one the most financially significant transactions a consumer will undertake.  Representations made by auto manufactures about the features, functionality and attributes of a vehicle are material and paramount to a consumer's purchasing decision.  Among the most important of these features is the vehicle's fuel economy and emissions certifications which have a material bearing on the on-going costs associated with the vehicle (e.g. fuel) as well as its future value, while also carrying environmental ramifications. .

3.      Fuel economy is such an important factor in the purchase of a vehicle that its disclosure to consumers is mandated by law. Moreover, in order for fuel economy ratings to be meaningful, the Environmental Protection Agency ("EPA") requires auto manufacturers to use

CLASS ACTION COMPLAINT

specific testing methods and procedures from which fuel economy calculations can be fairly assessed and then subsequently compared across all vehicle makes and models.

4.      Over the past several years, the consuming public has been plagued by abuses among auto manufacturers who have purposefully skewed and misrepresented fuel consumption and emission results in an effort to dupe the consuming public into purchasing their vehicles. Justifiably, consumers relied on the representations, purchased vehicles whose material attributes were misrepresented and as a result suffered financial loss.

5.      Ford itself is no stranger to such behavior, and indeed was implicated only a few years ago when a study revealed discrepancies as high as 20 percent between stated and real-world fuel economy estimates for its 2013 Fusion and C-Max hybrids. As result of the study, and ensuing litigation, Ford was forced to adjust its consumption estimates on those vehicles and subsequently restated fuel economy results for several other of its 2013-2014 models (e.g. Ford lowered Lincoln MKZ's combined mileage estimate from 45 mpg to 38 mpg).[1]

6.      Despite the importance of accurate and reliable fuel economy and emission representations, Ford's checkered history, recidivist tendencies, and blind desire for economic gain have resulted in the matter complained of herein.

7.      On February 21, 2019, Ford announced that in September 2018, "a handful of employees raised a concern through our Speak Up employee reporting channel regarding the analytical modeling that is part of our U.S. fuel economy and emissions compliance process."  As a result, Ford was forced to admit that it had adopted a flawed approach to using road-load specifications to simulate how aerodynamic drag and tire friction can affect fuel economy outside testing labs. Significantly, Ford did not describe the problem as being vehicle specific, but rather that it would begin its evaluation with the 2019 Ranger and then "assess[] additional vehicles as well." Ford deliberately started its investigation with a new model that, upon information and belief, has limited sales.

---

[1] https://www.consumerreports.org/fuel-economy-efficiency/ford-emissions-under-criminal-investigation/

CLASS ACTION COMPLAINT

8. Unfortunately for the consuming public, the flawed testing that resulted in the misrepresentations of emissions and fuel efficiency are likely pervasive through the broader inventory of Ford vehicles.   Upon information and belief, the F-150, Ford's best-selling flagship pickup truck, was subject to this flawed testing and subsequently sold to the consuming public with inaccurate fuel economy figures.

9. Indeed, less than two months after its announcement, Ford revealed that the U.S. Department of Justice opened a criminal investigation over its flawed emissions-certification processes, specifically focusing on the auto maker's road-load estimations and coastdown procedures that are used to determine EPA fuel-efficiency figures.

10. Ford was well aware of the testing procedures, protocols and practices mandated by the EPA, which were designed to derive consistent and accurate fuel economy and emissions ratings across all makes and models of vehicles. These results were in turn to be disseminated to the consuming public who could rely upon them in making informed purchasing decisions. Despite this mandate, Ford failed to properly utilize the delineated procedures and protocols, and as result materially misrepresented the fuel consumption and emissions ratings of its vehicles. Consumers, such as the Plaintiff, reasonably relied on these representations in making their decision to purchase Ford vehicles and were damaged as a result.

11. Plaintiff, on behalf of all others similarly situated, alleges causes of action for: breach of express warranty, fraudulent concealment, unjust enrichment and the violation of Florida's Unfair and Deceptive Trade Practices Act and seeks to compel Defendant to fully and accurately disclose fuel consumption and emission ratings on all of its vehicles and fully remunerate Plaintiff and putative class members for their losses.

**PARTIES**

12. Plaintiff Dillon Drake is a resident of Sebring Park, Florida and owner of a F150 Raptor vehicle. ("Vehicle"). He purchased his F-150 Raptor from Bill Jarrett Ford in Avon Park, Florida in March, 2019. Had Plaintiff known at the time he purchased his vehicle that Ford mispresented the fuel consumption and emissions ratings, he would not have purchased the vehicle,

1  or purchased the vehicle at a price materially less than what he paid.  As a result of Ford's

2  misrepresentations, Plaintiff did not receive the vehicle which he was promised, and also incurred

3  additional out-of-pocket losses as a result of having to pay for extra fuel.

4         13.  Defendant Ford Motor Company is a Delaware company with its principal place of

5  business in Dearborn Michigan. It conducts business in all fifty states, including Florida.

6         14.  Ford manufactures, sells, and warrants Plaintiff's vehicle and those sold to members

7  of the classes Plaintiff seeks to represent. Ford is responsible for all advertisements related to the

8  affected vehicles as well as all legal representations regarding the vehicles' attributes, including its

9  fuel consumption and emissions ratings. Ford is also responsible for certifying the accuracy of the

10  content contained on the legally mandated window stickers, in all warranty booklets, advertisements,

11  and other promotional materials relating to the affected vehicles.

12  **JURISDICTION AND VENUE**

13         15.  This Court has subject matter jurisdiction over this action under the Class Action

14  Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of

15  interest and costs. There are thousands of putative class members, at least some of whom have a

16  different citizenship from Defendant.

17         16.  This Court has jurisdiction over Defendant. Plaintiff purchased a vehicle from

18  Defendant in this District. Through its business operations in this District, Defendant intentionally

19  avails itself of the markets within this District to render the exercise of jurisdiction by this Court just

20  and proper.

21         17.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial

22  part of the events and omissions giving rise to this action occurred in this District. Plaintiff

23  purchased his vehicle from Defendant in this District. Ford sells tens of thousands of vehicles in this

24  District and has caused harm to Plaintiff and Class Members residing in this District.

25

26

27

28

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**STATEMENT OF FACTS**

**A.  *The Importance of Fuel Economy Figures***

18.      It is axiomatic that fuel economy is a material consideration that factors heavily in a reasonable consumer's decision to purchase a vehicle. Unsurprisingly, a report released in 2018 found that "car and truck buyers are willing to pay a premium for improved fuel economy."[2] The study, commissioned by Consumers Union, found that, "on average, consumers reported they would spend over $1,000 more on a vehicle to save $100 per year in fuel costs–or nearly $700 for each additional mile per gallon ("MPG"). The study also found that consumers value fuel economy significantly more than acceleration and premium features when considering purchasing a vehicle." *Id.*

19.      Indeed, the materiality of certain representations pertaining to the purchase of a vehicle were deemed so important that, by law, they are required to be emblazoned on the driver side window of every new car sold in the United States so that every consumer is invariably presented with these representations in advance of making a vehicle purchase.  Of the myriad of possible representations that could be made about a vehicle, the window sticker contains the six most pertinent to consumers. Among them – the city and highway fuel economy ratings, as determined by the United States Environmental Protection Agency.

20.      The importance of fuel economy to consumers is not lost on Ford who often touts its F-150 as being the "Best in Class" for gas mileage. "Ford is keen to keep its title of having the best-selling pickup truck for four decades. In 2017 America, that means having a tough-to-find combination of features, comfort, performance, and something that's always been elusive in the full-size truck genre, fuel economy. To that end, Ford says its two-wheel drive 2018 F-150 with the 2.7-liter EcoBoost V6 and all-new 10-speed automatic can achieve a combined 22 miles per gallon. Broken down, that translates to an EPA-estimated 20 mpg in the city, with an impressive 26 mpg

---

[2] https://advocacy.consumerreports.org/press_release/new-study-finds-consumers-are-willing-to-pay-more-for-fuel-economy-as-auto-regulators-look-to-roll-back-efficiency-standards/ (last visited May 9, 2019)

CLASS ACTION COMPLAINT

highway. Those figures are good enough to give the F-150 best-in-class honors for fuel economy from a gas engine." [3]

21.    As detailed below, Ford's representations as to the fuel efficiency of its vehicles are rendered false and misleading by its use of faulty computer modeling, deficient testing methods, procedures and practices that were inconsistent with those mandated by the EPA.

### B. The Process of Determining and Reporting Fuel Consumption and Emissions Figures

22.    The EPA assures consumers that the MPG estimates on the vehicle's window stickers and as further represented by auto manufacturers are "based on standardized laboratory test procedures to ensure they are reliable, repeatable, and fair across different car models." [4] "That means consumers can compare mpg for different vehicles on an 'apples-to-apples' basis to determine which vehicle is more fuel efficient.." [5] The EPA's fuel economy tests were rigorously developed and refined over a number of years to be correlated with national average values for a variety of real-world driving conditions, including stop-and-go traffic, cold weather, air conditioning use, and high speed and aggressive driving. Moreover, "all EPA fuel economy test results are adjusted downward to reflect many other variables that are not incorporated into our tests such as wind, hills, and road conditions." [6] The EPA tests vehicles in controlled laboratory conditions in order to establish what it calls "a level playing field for all cars" and to ensure that "test results are consistent, accurate, repeatable, and equitable among different vehicle models and manufacturers." [7] Vehicles are driven on a dynamometer (a device similar to a treadmill) using five standardized driving patterns or test cycles which represent a variety of driving conditions including speed,

---

[3] https://www.motor1.com/news/176394/ford-f150-fuel-mileage-towing-capacity/ (last visited May 10, 2019); https://www.cnet.com/roadshow/news/2018-ford-f-150-touts-best-in-class-towing-payload-fuel-economy/ ("2018 Ford F-150 touts best-in-class towing, payload, fuel economy").

[4] https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34102&flag=1 (last visited May 9, 2019).

[5] *Id.*

[6] *Id.*

[7] *Id.*

CLASS ACTION COMPLAINT

1  acceleration, braking, air conditioning use, and ambient temperatures. The test results from the five

2  driving cycles are combined to yield individual city and highway fuel consumption values.

3      23.     The EPA's testing procedures and protocols are detailed and disseminated to auto

4  manufacturers who are legally obligated to use these procedures and protocols in testing their

5  vehicles in order to determine the fuel consumption and emissions figures that are ultimately

6  presented to consumers on vehicle window stickers and elsewhere.[8]

7      24.     For example, the EPA defines, "road-load" as the force imparted on a vehicle while

8  driving at constant speed over a smooth level surface from sources such as tire rolling resistance,

9  driveline losses, and aerodynamic drag."[9] See e.g., 40 CFR §86.129-00, §600.005, §600.006,

10  §600.007. The EPA explains that a "dynamometer is used to simulate conditions of actual on-road

11  operation…..[Moreover], [b]ecause it is difficult to measure road-load directly, EPA has adopted the

12  coastdown method to characterize road-load force. During a coastdown test the vehicle is allowed to

13  decelerate with the transmission in neutral while its speed is periodically measured." *Id.* This

14  guidance is the latest in a series from the EPA promulgated specifically to "clarif[y] the

15  manufacturer's responsibilities when using the allowed flexibilities in determining the road-load

16  force settings, sets the acceptable road-load force tolerance for production vehicle audits, and

17  highlights consequences for testing compliance vehicles with inaccurate road-load force

18  specifications." *Id.*

19      25.     The road-load force specification for all vehicles covered by a certificate of

20  conformity and dynamometer settings used during emissions testing are required to be reported in

21  the application for certification. Certificates of conformity issued by EPA are conditioned on

22  production vehicles being in all material respects as described in the application for certification

23

24  [8] *See e.g.* EPA may test, or require the manufacturer to test, production vehicles to verify the
25  accuracy of the manufacturer's reported road-load specification and dynamometer settings (40 CFR
    Part 86 subpart G, §86.1835, §86.1836, Part 600 §600.008).
26
27  [9] EPA CD-15-04 (LDV/LDT/ICI/LIMO) SUBJECT: Determination and Use of Vehicle Road-Load
    Force and Dynamometer Settings. Available at
28  https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34102&flag=1

(reference 40 CFR §86.1848-01). EPA may deny, suspend, or revoke certificates of conformity where it finds that production vehicles have road-load forces that differ substantially from the road-load specification in the application for certification (reference 40 CFR §86.1850-01). Manufacturers failing to provide accurate vehicle road-load specification information in their applications for certification may also be subject to enforcement action, including civil penalties. *Id.*[10]

26.     The EPA sums up its mandate, and the obligation of auto manufactures as follows:

Congress directed EPA to establish test methods and procedures to measure the fuel economy of passenger car and trucks, and to provide this information to the public. We designed our test procedures to reflect national-average, "real world" driving conditions. The tests are standardized for all vehicles and conducted in a controlled laboratory setting, ensuring they are repeatable, reliable, and fair.

If auto manufacturers each designed their own procedure for measuring and reporting mpg, consumers would not be able to make 'apples-to-apples' comparisons of mileage among different car models. By contrast, EPA's standardized test procedures create a level playing field for all vehicles. Consumers can rely on these values when trying to determine which vehicles are more fuel efficient.

Each year, EPA tests a subset of the new vehicle models at our National Vehicle and Fuel Emissions Laboratory (NVFEL) in Ann Arbor, Michigan to verify that the fuel economy estimates provided by auto manufacturers are accurate.

Auto manufacturers are responsible for testing vehicles in their laboratories according to EPA test specifications and reporting fuel economy values to EPA.

EPA re-tests a subset of these vehicles each year at its National Vehicle and Fuel Emissions Laboratory in Ann Arbor, Michigan. Some vehicle models are selected for testing because of consumer complaints; others are selected at random. Historically, we have audited between 10% and 15% of new vehicle models (or about 150-200 vehicles), but this has grown to 15%-20% in recent years.

In 2011 and 2012, EPA began performing an audit program of manufacturers' coastdown tests. Coastdown testing is used to develop the dynamometer inputs for each vehicle model, so that the laboratory tests accurately replicate its tire rolling resistance, friction due to bearings and brakes, and aerodynamics.

---

[10] This guidance is effective beginning with the 2017 model year. Prior to MY 2017 the road-load confirmation procedures specified in AC55 will continue to be used.

CLASS ACTION COMPLAINT

The EPA sets forth detailed methodology and testing to auto manufacturers in order for them to conduct testing using uniform methodologies and procedures which would render results that consumers could rely on and provide accurate "apples-to-apples" comparisons necessary for their purchasing decisions.[11]

C. *The February 21, 2019 Announcement & Department of Justice Criminal Investigation*

27.     Unbeknownst to the public, in September 2018, several Ford employees internally reported a flaw in the analytical modeling Ford uses to calculate fuel economy ratings and emissions compliance of its vehicles. Four months later on February 21, 2019, Ford announced publicly that it had adopted a flawed approach to using road-load specifications to simulate how aerodynamic drag and tire friction can affect fuel economy outside testing labs and to that end notified the EPA, retained legal counsel and retained independent industry technical experts.[12] Ford noted that the flaw was not vehicle specific and that in conjunction with regulators and independent consultants it would undertake an evaluative process beginning with the 2019 Ranger, but "assessing additional vehicles as well." *Id.*

28.     Despite its best efforts to mitigate the gravity of its wrong-doing, approximately eight weeks later, in a mandated quarterly public filing with the Securities Exchange Commission, Ford revealed that the U.S. Department of Justice opened a criminal investigation over its flawed emissions-certification processes. The probe, as described by Ford, currently focuses on the company's road-load estimations, including analytical and coastdown procedures used to determine published Environmental Protection Agency (EPA) fuel-efficiency figures.[13]

---

[11] EPA, Office of Transportation and Air Quality, EPA-420-F-14-015 April 2014.

[12] https://www.campaign.ford.com/campaignlibs/content/fordmedia/fna/us/en/news/2019/02/21/ford-investigating-process-for-us-emissions-certification-conc.html (last visited May 10, 2019).

[13] Ford Motor Company, Form 10-Q for the period ending March 31, 2019 available at https://seekingalpha.com/filing/4456259.

29.     As reported by Consumer Reports, the investigation involves "overstated" fuel mileage on a "large number" of models.[14] Moreover, inaccurate fuel-efficiency numbers also directly affect emissions standards reported for these vehicles.

30.     The materiality of these misrepresentations is underscored by the fact fuel consumption and emissions cheating has become pervasive in the industry. In the past several years alone, Volkswagen admitted to circumventing the emissions control system in more than 600,000 vehicles; Ram pickup trucks and Jeep SUVs with diesel engines admitted cheating on emissions tests; and Hyundai restated fuel economy results for several models from 2011 through 2013, to name only a few. *Id.*

31.     Notably, Ford itself is no stranger to such cheating. A Consumer Reports study found discrepancies as high as 20 percent between stated and real-world fuel economy estimates for the 2013 Ford Fusion and C-Max hybrids.  *Id.* Ford subsequently had to adjust its fuel economy estimates on those vehicles. It also revealed a systemic problem at Ford which resulted in the restatement of fuel economy results for several other 2013-2014 models.

32.     In each of these instances, the auto manufacturer corrected its misrepresentations, and financially compensated affected consumers. The same should result here.

## CLASS ACTION ALLEGATIONS

33.     Plaintiff seeks relief on behalf of himself and as representatives of all others who are similarly situated. Pursuant to Fed. R. Civ. P. Rule 23(a), (b)(2), (b)(3) and (c)(4), Plaintiff seeks certification of classes defined as follows:

> All persons in the United States who purchased or leased a Ford vehicle whose fuel economy values were less than the fuel economy values produced by EPA testing. ("Nationwide Class").

---

[14] Consumer Reports, April 26, 2019, Ford Is Under Criminal Investigation for Emissions-Testing Program."

CLASS ACTION COMPLAINT

All persons in the State of Florida who purchased or leased a Ford vehicle whose fuel economy values were less than the fuel economy values produced by EPA testing. ("Florida Class").

34.    Excluded from the Class are Defendant and any of its affiliates, parents or subsidiaries; all persons who make a timely election to be excluded from the Class; government entities; and the judges to whom this case is assigned, their immediate families, and court staff.

35.    Plaintiff hereby reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery.

36.    The proposed Class meets the criteria for certification under Rule 23(a), (b)(2), (b)(3) and (c)(4).

37.    **Numerosity. Fed. R. Civ. P. 23(a)(1).**  Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical.  While the exact number of vehicle purchasers is unknown, upon information and belief, Ford sells tens of thousands of vehicles every year and therefore meets the numerosity requirement of 23(a)(1).

38.    **Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).**  Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class members. The common questions include:

a.    Whether Ford mispresented the fuel economy and emissions ratings of Class Vehicles;

b.    Whether Ford knew or should have known that its computer modeling, testing procedures and protocols for determining EPA fuel-economy figures were inaccurate;

c.    Whether knowledge of accurate EPA fuel-economy figures would be important to a reasonable person,

d.    Whether Ford failed to disclose and concealed from potential customers the fact that it inaccurately evaluated EPA fuel-economy figures;

CLASS ACTION COMPLAINT

      e.   Whether Ford breached its warranty obligations;

      f.   Whether Ford committed fraud through its action, inactions, representations and omissions;

      g.   Whether Ford engaged in unfair or deceptive acts or practices in violation of Florida's Unfair And Deceptive Trade Practices Act;

      h.   Whether Ford's conduct, as alleged herein, entitles Plaintiff and the Classes he seeks to represent to damages or restitution;

      i.   Whether Plaintiff and Class Members are entitled to relief.

39.    **Typicality. Fed. R. Civ. P. 23(a)(3).**  Consistent with Rule 23(a)(3), Plaintiff's claims are typical of those of other Class members.  Plaintiff is an owner or lessee of a Ford vehicle whose EPA fuel-economy figures were materially understated. Plaintiff's damages and injuries are akin to other Class members, and Plaintiff seeks relief consistent with the relief sought by the Class.

40.    **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class he seeks to represent; is committed to pursuing this matter against Defendant to obtain relief for the Class; and has no conflicts of interest with the Class. Moreover, Plaintiff's Counsel are competent and experienced in litigating class actions, including litigation of this kind. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

41.    **Superiority. Fed. R. Civ. P. 23(b)(3).**  Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system. Individual litigation creates the potential for

CLASS ACTION COMPLAINT

1    inconsistent or contradictory judgments and increases the delay and expense to all parties and the

2    court system. By contrast, the class action device presents far fewer management difficulties and

3    provides the benefits of a single adjudication, economies of scale, and comprehensive supervision

4    by a single court.

5          42.    **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule

6    23(b)(2) and (c). Defendant, through their uniform conduct, acted or refused to act on grounds

7    generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to

8    the Class as a whole.

9          43.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification

10   because such claims present only particular, common issues, the resolution of which would advance

11   the disposition of this matter and the parties' interests therein.

12         44.    Finally, all members of the proposed Classes are readily ascertainable. Defendant has

13   access to customer names and addresses. Using this information, Class members can be identified

14   and ascertained for the purpose of providing notice.

15         45.    Discovery Rule. Plaintiff's and Class Members' claims accrued upon discovery that

16   Ford has been misrepresenting the fuel efficiency of its vehicles. While Ford knew, and concealed,

17   the fact that it had been misrepresenting the fuel efficiency of its vehicles, Plaintiff and Class

18   Members could not and did not discover this fact through reasonable diligence.

19         46.    Active Concealment Tolling. Any statutes of limitations are tolled by Ford's knowing

20   and active concealment of the fact that it had not been using sanctioned testing and protocols to

21   establish proper fuel efficiency rations for its vehicles. Ford had knowledge of this fact which was

22   not known to nor easily discoverable by Plaintiff and Class Members. Despite its affirmative duty

23   to disclose this fact, Ford kept Plaintiff and Class Members ignorant of vital information essential to

24   the pursuit of their claim, without any fault or lack of diligence on the part of Plaintiff. The details

25   of Ford's efforts to conceal its above-described unlawful conduct are in its possession, custody, and

26   control, to the exclusion of Plaintiff and Class Members. Plaintiff and Class Members could not

27   have reasonably discovered the fact that Fraud had artificially inflated fuel efficiency ratings

28

47.     Estoppel. Ford was and is under a continuous duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the fuel efficiency ratings in Class Vehicles. At all relevant times, and continuing to this day, Ford knowingly, affirmatively, and actively concealed the true character, quality, and nature of such ratings. Vehicles. The details of Ford's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class Members. Plaintiffs reasonably relied upon Ford's active concealment. Based on the foregoing, Ford is estopped from relying on any statutes of limitation in defense of this action.

48.     Equitable Tolling. Ford took active steps to conceal the fact that it wrongfully, improperly, illegally, and repeatedly manufactured, marketed, distributed, sold, and leased Class Vehicles with inaccurate fuel economy ratings. The details of Ford's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class Members. However, Ford's failure to disclose and active concealment of this fact amounts to bad faith and deception in and of itself. When Plaintiffs learned about this material information, they exercised due diligence by thoroughly investigating the situation, retaining counsel, and pursuing their claims. Ford fraudulently concealed its above described wrongful acts. Should such tolling be necessary, therefore, all applicable statutes of limitation are tolled under the doctrine of equitable tolling.

### FIRST CAUSE OF ACTION
### EXPRESS WARRANTY
### (ON BEHALF OF ALL CLASSES)

49.     Plaintiff restates and realleges paragraphs 1 through 48 above as if fully set forth herein.

50.     Ford provides all purchasers and lessees of the Class Vehicles with express warranties including but not limited to Emissions Defect Warranties and Emissions Performance Warranties which became part of the basis of the bargain.

51.     Ford breached these warranties by selling and leasing Class Vehicles with misrepresented fuel-economy figures.

CLASS ACTION COMPLAINT

52.     Plaintiff notified Ford of the breach within a reasonable time or was not otherwise required to do so, because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford knew of the defect alleged herein and chose to conceal it and to fail to comply with its warranty obligations.

53.     Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under these circumstances. Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

54.     The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Plaintiff and Class Members. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford.

55.     Plaintiff and Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of those obligations as a result of Ford's conduct described herein.

56.     As a direct and proximate cause of Ford's breach, Plaintiff and the other Class Members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

57.     Plaintiff and Class Members have also incurred and will continue to incur damages in the form of additional fuel costs as a result of the inaccurate fuel economy representations.

58.     Plaintiff and Class Members are entitled to legal and equitable relief against Ford, including damages, consequential damages, specific performance, attorney fees, costs of suit, and such further relief as the Court may deem proper.

**SECOND CAUSE OF ACTION**
**FRAUDULENT CONCEALMENT/NONDISCLOSURE**
**(ON BEHALF OF ALL CLASSES)**

59.     Plaintiff restates and realleges paragraphs 1 through 48 above as if fully set forth herein.

60.     Ford knew or should have known that the Class Vehicles were and are defective because the EPA fuel-economy figures associated with each vehicle was materially inflated and mispresented.

61.     Ford fraudulently concealed from and/or failed to disclose to Plaintiff and Class Members the fact that it was not employing proper testing protocols and procedures mandated by the EPA from which fuel-economy figures for its vehicles are properly derived.

62.     Ford was and is under a duty to Plaintiff and the Classes to disclose these facts because: Ford is in a superior position to know the facts surrounding the testing protocols and procedures it actually used to determine fuel-economy figures and Ford actively represented fuel-economy figures which were materially overstated.

63.     The fuel-economy figures which were not concealed and/or disclosed by Ford to Plaintiff and the Classes are material facts that a reasonable person would have considered important in deciding whether or not to purchase (or to pay the same price for) a motor vehicle.

64.     Ford intentionally, willfully, maliciously or recklessly concealed and/or failed to disclose that the fuel-economy figures were not accurate for the purpose of inducing Plaintiff and members of the Classes to purchase their vehicles.

65.     Plaintiff and Class Members did not know about the inaccuracy of the fuel-economy figures and could not have known about them when they purchased the their vehicles because of Ford's active concealment.

66.     Plaintiff and the Class justifiably acted or relied upon—to their detriment—the concealed and/or non-disclosed facts as evidenced by their purchases of their vehicles.

67.     Had Plaintiff and members of the Classes known of the misrepresentation, they would not have purchased (or would have paid substantially less for) their vehicles.

CLASS ACTION COMPLAINT

68.     As a direct and proximate result of Ford's misconduct, Plaintiff and Class Members have suffered actual damages in that they bought and own vehicles which were sold on the basis of materially inaccurate fuel-economy figures.

69.     Plaintiff and Class Members have suffered losses resulting from Ford's fraudulent or reckless non-disclosure. Accordingly, Ford is liable for all damages proximately caused by its conduct in an amount to be proven at trial.

70.     Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class Members' rights and the representations that Ford made to them, in order to enrich Ford.

71.     Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future in an amount to be determined according to proof.

### THIRD CAUSE OF ACTION
### UNJUST ENRICHMENT
### (ON BEHALF OF ALL CLASSES)

72.     Plaintiff restates and realleges paragraphs 1 through 48 above as if fully set forth herein.

73.     As set forth above, Plaintiff and other Class members have suffered from purchasing vehicles with artificially inflate EPA fuel-economy figures.

74.     As a result of its wrongful and fraudulent acts and omissions, as set forth herein, Ford charged a higher price for its vehicles than their true value and Ford, therefore, obtained monies that rightfully belong to Plaintiff and other Class members.

75.     Ford has benefitted from manufacturing, selling, and leasing at an unjust profit defective Class Vehicles whose value was artificially inflated by Ford's concealment of their true fuel-economy figures.

76.     Ford enjoyed the benefit of increased financial gains, to the detriment of Plaintiff and other Class members, who paid a higher price for their vehicles that actually had lower values.

77.     Ford has received and retained unjust benefits from the Plaintiff and other Class members, and inequity has resulted.

78.     It would be inequitable and unconscionable for Ford to retain these wrongfully obtained benefits.

79.     Because Ford concealed its fraud and deception, Plaintiff and other Class members were not aware of the true facts concerning their vehicles and did not benefit from Ford's misconduct.  Ford knowingly accepted and retained the unjust benefits of its fraudulent conduct.

80.     As a result of Ford's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and other Class members, in an amount to be proven at trial. Plaintiff and other Class members, therefore, seek an order establishing Ford as a constructive trustee of the profits unjustly obtained, plus interest.

**FOURTH CAUSE OF ACTION**
**VIOLATIONS OF THE OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT, FLA. STAT. §§ 501.201, *et seq.***
**(ON BEHALF OF THE FLORIDA CLASS ONLY)**

81.     Plaintiff restates and realleges Paragraphs 1 through 48 as if fully set forth here.

82.     Plaintiff and Class Members are purchasers and lessors of Ford Vehicles.

83.     Defendant engaged in the conduct alleged in this Complaint, including but not limited to not using proper testing protocols and procedures mandated by the EPA from which fuel-economy figures for its vehicles are properly derive, fraudulently concealing from and/or failing to disclose to Plaintiff and Class Members the fact that it was not employing proper testing protocols, and misstating fuel-economy figures for its vehicles, which did result in the sale or lease of a vehicle to Plaintiff and Florida Class Members.

84.     Defendant engaged in, and its acts and omissions affect, trade and commerce. Defendant's acts, practices, and omissions were done in the course of Defendant's business of car manufacturing and sales throughout the United States, including the state of Florida.

85.     Defendant, operating in Florida, engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of Fla. Stat. § 501.204(1), including but not limited to the following: failure to accurately represent vehicle fuel-economy figures.

86.     These unfair acts and practices violated duties imposed by laws and regulations.

87.     As a direct and proximate result of Defendant's violation of the Florida Unfair and Deceptive Trade Practices Act, Plaintiff and Florida Class members suffered damages including, but not limited to damages from increased expenditures for fuel and the diminished value of their vehicles resulting from being sold with inflated fuel-economy figures.

88.     Also, as a direct result of Defendant's knowing violation of the Florida Unfair and Deceptive Trade Practices Act, Plaintiff and Florida Class members are entitled to damages as well as injunctive relief, including, but not limited to ordering that Ford fully comply with testing procedures and protocols established by the EPA for the determination of fuel-economy figures.

89.     Plaintiff brings this action on behalf of himself and Florida Class Members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiff, Florida Class Members and the public from Defendant's unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and unlawful practices. Defendant's wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

90.     The above unfair and deceptive practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Florida Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

91.     Defendant knew or should have known that the practices, procedures and computer modeling employed to determine the fuel-economy figures of its vehicles was improper and resulted in the artificial inflation of those figures.

92.     Defendant's actions and inactions in engaging in the unfair practices and deceptive acts described herein were negligent, knowing and willful, and/or wanton and reckless.

93.     Plaintiff and Florida Class Members seek relief under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*, including, but not limited to, damages, restitution, injunctive relief, and/or attorney fees and costs, and any other just and proper relief.

**WHEREFORE**, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests the following relief:

      a.  An Order certifying this case as a class action;

      b.  An Order appointing Plaintiff as the class representative;

      c.  An Order appointing undersigned counsel as class counsel;

      d.  A mandatory injunction directing the Defendant to hereinafter adequately report fuel-economy figures;

      e.  An award of damages;

      f.  An award of costs and expenses;

      g.  An award of attorneys' fees; and

      h.  Such other and further relief as this court may deem just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff demands a jury trial as to all issues triable by a jury.

.

Dated: May 10, 2019

/s/ *John A. Yanchunis*
John A. Yanchunis
jyanchunis@forthepeople.com
**MORGAN & MORGAN
COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Tel: (813) 223-5505

Mike Morgan
MMorgan@forthepeople.com
**MORGAN & MORGAN
COMPLEX LITIGATION GROUP**
20 N. Orange Avenue, Suite 1600
Orlando, FL 32801